### AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Kevin O'Dowd, being first duly sworn, hereby depose and state as follows:

**Introduction and Agent Background**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of a cellular phone—a OnePlus smartphone owned by and seized from Wilmer FUENTES-Benitez on April 9, 2022 (hereinafter, FUENTES's PHONE), that is currently in storage at the United States Border Patrol (USBP) Sector Intelligence Unit in Swanton, Vermont that is described below and with particularity in Attachment A—and the seizure from that device of the electronically stored information described in Attachment B.  The applied-for warrant would authorize the forensic examination of the Subject Electronics for evidence of alien smuggling in violation of 8 U.S.C. §§ 1324 and 1325 (including conspiracy to commit offenses within that Title).  Through my training and experience, I know that FUENTES's PHONE has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when FUENTES's PHONE first came into the possession of USBP.  Based on the facts set forth in this affidavit, there is probable cause to believe that violations of, or attempts to violate, Title 8, United States Code, Section 1324 have been committed by FUENTES and others and that evidence of those violations would likely be found on FUENTES's PHONE.

2. I am a Border Patrol Agent (BPA) of the USBP, a component of Customs and Border Protection (CBP) within the Department of Homeland Security (DHS).  I have been so employed since July 17, 2006.  I am currently assigned to the Richford (Vermont) Border Patrol Station as a Border Patrol Agent (Intelligence) [BPA(I)].  I have been assigned to the Richford Station as a BPA(I) for approximately 1.5 years.  I was previously assigned to the Sierra Blanca

1

(Texas) Border Patrol Station as a BPA for approximately 6 years and to the Special Operations Group Headquarters in El Paso, Texas as a Border Patrol Search Trauma and Rescue Operator for approximately 8 years.

     3. As part of my present duties, I investigate criminal violations of the Immigration and Nationality Act as codified in Title 8 of the United States Code, as well as violations of other federal criminal codes. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C). I received formal training to identify and investigate alien- and drug-smuggling activities both at the USBP Academy and through regular and recurring on-the-job training and annual Performance and Learning Management System course certification. In my experience, and the experience of agents with whom I have consulted, electronic devices are commonly used to facilitate smuggling events by coordinating transportation and drop-off / pick-up locations via global positioning system applications and verbal and/or non-verbal communications relayed over Wi-Fi and/or a cellular network.

     4. The information in this affidavit comes from my personal observations and investigation, my training and experience, reports made available to me by other law enforcement authorities, analysis of documents and DHS records, and my discussions with other law enforcement officers who have direct knowledge of the events described below. As a result of my participation and review of past and present reports made by agents of the USBP, I am fully familiar with the facts and circumstances of this investigation. This affidavit is intended to show only that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter. Unless otherwise noted, descriptions in this affidavit of statements made by witnesses or during interviews are related here in part, sum, and substance and are not direct or full quotations.

## Probable Cause

5. On Saturday April 9, 2022, at approximately 8:45 pm (EDT), Border Patrol Agents at the Richford Border Patrol Station were notified by Swanton Sector Communications (KAD640) that several people walking south toward the international border between the United States and Canada were captured in an image taken by a remotely operated camera placed in a wooded area directly adjacent to the international border within the Richford Area of Responsibility (AOR). The camera is activated by motion within its field of view; it automatically records images when motion is detected and transmits them to USBP computer systems where they can be viewed by USBP personnel. Border Patrol Agents place cameras such as this one in areas known to have been used by smugglers or undocumented aliens attempting to cross the border without inspection by immigration officers.

6. The camera that activated on April 9, 2022, was located along the international border approximately 2.25 miles east of the Morses Line Port of Entry (POE) and several yards north of a bend in Pidgeon Hill Road. Pidgeon Hill Road is a dead-end road that lies approximately 20 yards south of the international border at its northernmost point. Richford USBP agents were aware that the area has been periodically used by alien smugglers in the preceding year.

7. After being notified of the camera activation, BPA Daniel Graves responded to the camera location in a marked USBP truck to determine if the subjects seen in the images had made unlawful entry into the United States. While BPA Graves investigated the camera location, I began traveling along Morses Line Road, which intersects Pidgeon Hill Road approximately 1.2 miles south of the international border. I know from my experience working in the Richford AOR that aliens entering the United States without inspection will often hire

alien smugglers to pick them up along a road near their point of entry. I further knew that alien smugglers working in the Richford AOR will most commonly use privately owned or rented vehicles bearing non-Vermont license plates when transporting aliens. As Morses Line Road primarily serves a sparsely populated rural area of western Vermont, it is uncommon for vehicles with non-Vermont license plates to travel on this road, particularly at night.

8. At approximately 9:05 pm (EDT), I observed a vehicle turning northbound onto Pidgeon Hill Road from Morses Line Road. I followed the vehicle onto Pidgeon Hill Road and saw that it was a red Toyota Tundra pickup truck with Pennsylvania license plates. As the pickup truck approached the international border at the northernmost point of Pidgeon Hill Road, where BPA Graves was parked in his marked USBP truck, the pickup truck turned off the road away from BPA Graves. As the pickup truck drove through a grassy farm field toward the international border, BPA Graves activated his vehicle's emergency lights to initiate a vehicle stop. The pickup truck yielded approximately 10 yards south of the international border. I stopped behind the pickup truck to assist BPA Graves and question the occupants as to their citizenship and purpose in the area.

9. I notified KAD640 that BPA Graves and I were conducting a vehicle stop on the Toyota Tundra, and I requested records checks on the pickup truck's license plate (Pennsylvania ZPW8470). BPA Graves was already at the driver's side window when I approached the pickup truck on the driver's side and saw that the truck was occupied by two people. BPA Graves handed me a Pennsylvania driver's license that identified the driver as Amaury Alberto PENA-Valdez. BPA Graves informed me that the passenger, who was later identified as Wilmer FUENTES-Benitez, did not possess any identification and that he did not appear to speak English. I returned to my vehicle to request records checks on PENA while BPA Graves

4

continued questioning PENA and FUENTES.

10. When I returned to the pickup truck, BPA Graves informed me that PENA claimed to be a U.S. citizen and that FUENTES claimed to be a citizen of Honduras and that FUENTES could not present any valid U.S. immigration documents to be in, remain in, or pass through the U.S. legally. BPA Graves placed FUENTES under arrest and moved him to the secure backseat of his USBP truck for officer safety and to continue interviews of PENA and FUENTES separately. Supervisory BPA (SBPA) Troy Edwards arrived on scene to assist at approximately that time.

11. While BPA Graves moved FUENTES into his truck, I questioned PENA as to his purpose in the area. PENA stated that he had come to help a friend with something. I asked who the friend was, PENA stated that he didn't know. I asked what task PENA had come to help with, and PENA stated he didn't know that either; he claimed he just believed in helping people when they asked. I asked PENA if this area was his intended destination, and he replied that he was following directions on his smartphone. PENA stated he neither knew where he was meant to go nor realized the directions on his phone were taking him to the border.

12. I then went to BPA Graves's truck to obtain FUENTES's biographical information for records checks. The passenger identified himself as Wilmer FUENTES-Benitez, and he stated he was a citizen of Honduras. I asked FUENTES how he had last entered the U.S., and he told me he entered illegally through Texas in or about May 2011. Records checks through KAD640 revealed no valid immigration status or petitions pending under FUENTES's name.

13. When I returned to PENA's pickup truck, BPA Graves instructed PENA to exit the pickup truck. BPA Graves placed PENA in handcuffs for officer safety and moved PENA into the secure backseat of SBPA Edwards's USBP vehicle.

14. I asked PENA for consent to review recent communications on his phone to help confirm what he had told me earlier regarding his purpose in the area. PENA consented to the search and entered his passcode to unlock his smartphone. In reviewing recent text and multimedia messages, I found a notable conversation that took place on the WhatsApp messenger application with a contact saved as "Herman (Valcourt) Copaneco Mayor" with phone number (610) 203-1329. PENA and "Herman" appeared to discuss a trip to Vermont to pick up 3 or 4 people. On Thursday April 7, PENA asked "Herman" via text message if they were in agreement on the price, to which "Herman" replied that they agreed on "2,000" of an unspecified currency. PENA then asked "Herman" for the address where they were going, and "Herman" sent a Google Maps link containing the address 1268 Pidgeon Hill Rd, Franklin, VT. When this address is searched in Google Maps, it shows a location at nearly the exact place where PENA stopped his pickup truck in the farm field.

15. I asked PENA if he was discussing an alien smuggling event with "Herman", and PENA responded that he was discussing a $2,000 debt owed to him by "Herman", who PENA identified as FUENTES's brother-in-law. PENA stated "Herman" had asked him to come to Vermont to pick some people up, but claimed he was not previously aware that he would be picking them up at the border or that they may have been entering the U.S. illegally.

16. Also found in PENA's phone during my initial search was a conversation with a contact saved as "~W" with phone number (267) 338-7971. I asked PENA who that phone number belonged to, and he responded it belonged to FUENTES.

17. At approximately 22:30 pm (EDT), no illegal entry had yet been detected in the vicinity of the camera activation. PENA was released from the scene with his pickup truck. FUENTES was instructed to retrieve all his personal belongings from PENA's pickup truck

6

before it departed. Among the items he retrieved was a OnePlus smartphone (FUENTES's PHONE). FUENTES was transported to the Richford Border Patrol Station for immigration processing.

18. At approximately 22:55 pm (EDT), KAD640 notified agents that the camera north of Pidgeon Hill Road had been activated again, capturing images of three subjects walking north into Canada. These subjects appeared to be the same subjects previously seen walking south toward the U.S. in images captured by the remote device mentioned above.

19. After arriving at the Richford Border Patrol Station, I notified FUENTES of his *Miranda* rights as per DHS Form I-214. FUENTES said he understood these rights, and he signed form I-214 indicating such. I asked FUENTES if he was willing to answer questions without a lawyer present, and FUENTES stated he was not. FUENTES's PHONE was seized as evidence in an alien smuggling investigation, and FUENTES was turned over to the custody of Immigration and Customs Enforcement for immigration proceedings.

20. On April 11, 2022, I reviewed electronic documents created and maintained by Swanton SIU agents that recorded their investigation of a human smuggling organization (HSO) that included several participants based in Pennsylvania. Among these documents was a report of investigation that named FUENTES as a suspected alien smuggler working for the HSO. The report stated that FUENTES had been identified by name, address, and phone number as an accomplice during a proffer with another alien smuggler apprehended during a smuggling event in the Swanton Sector AOR in 2021.

**Information About Cellular Devices**

21. Based on my training and experience in this and other cross-border criminal investigations, individuals crossing the border illegally will often communicate and coordinate

with someone to pick them up once in the United States or to inform them that they are about to cross the border or that they successfully crossed the border without apprehension. Many alien-smuggling cases involve an individual acting as a foot guide for a group of aliens, and that foot guide typically communicates with the arranged transporter(s) using cellular devices to call, text, and share location data. Electronic devices typically retain data of sent and received communications, including content of the messages and the numbers of phones with which the devices communicated. Those data would assist investigators in determining the parties involved in a smuggling event and when and how the event was planned. Aliens and foot guides crossing the border illegally often use a cellular telephone's GPS or other mapping functions to search for potential crossing locations and to navigate during crossing events, and they frequently transmit locations to planned transporters in the United States. The devices' applications frequently store location data for long periods, often in manners not readily apparent to the users of the devices. I am also familiar with individuals crossing illegally into the United States using the camera feature of cellular devices to take photos or videos of the location where they crossed or where they are waiting to be picked up; those photos or videos may be informative to investigators on their face, or they may contain location metadata to assist agents in identifying locations used in smuggling events.

22. Individuals involved in alien-smuggling events often include transporters within the United States and within Canada and coordinators in both countries as well. These participants frequently communicate by cellular telephones with each other and with the aliens illegally entering the United States. The participants also often use a cellular telephone's GPS and mapping functions to select and send crossing locations, select and transmit potential pick-up locations, and select and navigate to routes of travel.

23. Based on my training, experience, and research, I know that FUENTES's PHONE has the following capabilities, among others: wireless cellular connectivity to the Internet and/or mobile communications network; connectivity with Wi-Fi signals; sending and receiving audio and visual information; digital compass and GPS navigation, location tagging, and tracking; a video camera for still photographs and video recording; a microphone and speaker for audio recording and playback; and a memory unit with a minimum storage capacity of multiple gigabytes. The memory unit on each phone can be used to store user information, voicemails, audio and visual recordings, browsing history, documents, images, and videos. Based on my training and experience, I know that examining data stored on devices of these types can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## Conclusion and Requests

24. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of FUENTES's PHONE, described in Attachment A, to seek the items described in Attachment B. Specifically, I believe probable cause exists that violations and attempted violations of 8 U.S.C. §§ 1324 and 1325 have occurred and that FUENTES, PENA, and other suspects known to the Swanton SIU were involved in those offenses. Further, I submit that probable cause exists to believe the contents of FUENTES's PHONE will contain evidence of those offenses.

25. FUENTES's PHONE is currently in the lawful possession of the United States Border Patrol and has been since April 9, 2022. I seek this warrant to ensure further examination of FUENTES's PHONE will comply with the Fourth Amendment and other applicable laws. Consistent with Rule 41(e)(2)(B), the requested warrant would permit the examination of FUENTES's PHONE in a manner that may require authorities to employ techniques including,

but not limited to, computer-assisted scans of the entire medium that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

26. Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

Dated at Burlington, in the District of Vermont, this 21 day of April 2022.

Kevin O'Dowd, BPA(I)
United States Border Patrol

Subscribed and sworn to before me on April 21st, 2022

Hon. Kevin J. Doyle, Magistrate Judge
United States District Court
District of Vermont

10